HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHERI NASETH,

   Plaintiff,

   v.

ACOUSTIC HOME LOANS, LLC, et al.,

   Defendants.

CASE NO. C09-1539RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on a motion for partial summary judgment (Dkt. # 15) from Plaintiff Cheri Naseth and a motion for summary judgment (Dkt. # 22) from Defendant Quintet Mortgage LLC ("Quintet"). Quintet requested oral argument solely on its own motion; Ms. Naseth did not request oral argument. The court finds oral argument unnecessary. For the reasons stated below, the court GRANTS in part and DENIES in part both motions. This order concludes with instructions regarding the bench trial scheduled for November 15, 2010.

## II. BACKGROUND

Ms. Naseth and Harold Suiste[1] used Quintet as their mortgage broker in their purchase of a home in Everett in the summer of 2005. The first documentary evidence of their transaction is a pair of good faith estimates ("GFEs") and Truth in Lending Act

---

[1] Ms. Naseth and Mr. Suiste were not married in the summer of 2005. They are married now.

ORDER – 1

("TILA") disclosures for a first and second mortgage. The first pair of documents, dated June 30, 2005, describes a 30-year loan for $231,160 at a 6.25% interest rate for a property with a purchase price of $288,950. Wagnon Decl. (Dkt. # 19), Ex. 1-2. The GFE also discloses in an area labeled "COMPENSATION TO BROKER (Not Paid Out of Loan Proceeds)" a "Broker Yield Spread" of "1-3%." *Id.*, Ex. 1. This is a disclosure of a yield spread premium.[2] The TILA disclosure contained a box next to the notation "VARIABLE RATE FEATURE: This loan contains a variable rate feature. A variable rate disclosure has been provided earlier." *Id.*, Ex. 2. The box for the "VARIABLE RATE FEATURE" is not checked. *Id.* Nonetheless, the TILA form discloses 24 payments of $1203.96, 335 payments of $1458.57, and a single payment of $1462.37. *Id.* Neither the GFE nor the TILA disclosure for the first loan contained a property address.

The GFE and TILA disclosure for the second loan, however, both note an address on Panaview Boulevard in Everett as the property to be purchased. Wagnon Decl. (Dkt. # 19), Ex. 3-4. This pair of documents is also dated June 30, 2005. *Id.* They disclose a loan for a second mortgage of $57,790 on a property with a purchase price of $288,950. *Id.* The TILA disclosure in this pair of documents, like the TILA disclosure for the first pair, does not have a checked "VARIABLE RATE FEATURE" box, although it also discloses varying payments: 24 of $481.10, 155 of $512.73, and a final balloon payment of $48,254.41. *Id.*, Ex. 4.

Quintet apparently generated both pairs of documents after a telephone conversation between one of its representatives and Ms. Naseth on or about June 30, 2005. The court uses the word "apparently" because there is no competent evidence that a telephone call occurred. John Wagnon, Quintet's sales manager, declares that "Quintet's records show that on or around June 30, 2005, Naseth and her husband Harold Suiste called Quintet to apply for a loan." Wagnon Decl. (Dkt. # 19) ¶ 3. Mr. Wagnon

---

[2] A yield spread premium is a payment from a lender to a mortgage broker for the delivery of a mortgage at a higher interest rate than the par interest rate based on the borrower's financial profile. *Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1204 n.2 (9th Cir. 2003).

ORDER – 2

does not declare that he has personal knowledge of this call, and he does not offer the "records" as evidence. There is no evidence from the Quintet representative who participated in the call. Ms. Naseth remembers a telephone conversation, but does not remember when it occurred. Naseth Depo. at 27.[3] She also remembers meeting *in person* with a Quintet representative on or about June 30. *Id.* at 26-27; *see also* Suiste Decl. (Dkt. # 27) ¶ 3 (describing meeting in June 2005 at Quintet's offices regarding a property in Marysville). For purposes of these motions, the court assumes that Quintet prepared the GFEs and TILA disclosures on June 30, as Mr. Suiste and Ms. Naseth do not argue otherwise. Although they dispute when they *received* the two pairs of GFEs and TILA disclosures, they do not dispute that Quintet generated them on or about June 30, 2005.

A GFE and TILA disclosure are typically generated after someone makes a loan application. In this case, the only evidence of a loan application is an unsigned, undated Uniform Residential Loan Application ("URLA") that provides information solely about Ms. Naseth. Naseth Depo., Ex. 11. Mr. Wagnon insists that Ms. Naseth signed a URLA on August 11, Wagnon Decl. (Dkt. # 19) ¶ 10, but he has not produced a signed application. The URLA states that it was completed in a telephone interview. Naseth Depo., Ex. 11 at p.3. The property address, purchase price, and loan information in the URLA match the information in the June 30 documents described above.

On July 13, 2005, a Quintet representative, Ms. Naseth, and Mr. Suiste met at Quintet's offices. The purpose of that meeting is not apparent from the record. There is no dispute that Ms. Naseth and Mr. Suiste signed a series of documents, including a loan application disclosure, a mortgage loan origination agreement, a page of Quintet mortgage disclosures, and a non-discrimination notice. Naseth Depo., Exs. 3-6. They also signed a "Borrower(s) Agreement to Application Terms," a single-page form

---

[3] Excerpts from the deposition of Ms. Naseth and exhibits thereto are at Exhibit A of the declaration of Amit Ranade. Dkt. # 24.

ORDER – 3

1  contract in tiny typeface in which they purportedly acknowledged review of a GFE and
2  agreed not to apply for loans from other lenders or brokers for 60 days.  Naseth Depo.,
3  Ex. 7.  Relying in part on that agreement, Quintet asserts that Ms. Naseth reviewed the
4  GFEs at the July 13 meeting, but Quintet misstates the evidence.  Ms. Naseth admitted
5  that she saw the GFEs at some point.  Naseth Depo. at 38.  She did not remember when
6  she saw them, and she did not remember whether it was before or after her meeting with
7  Quintet.  *Id.*  She later asserted that she did not see a GFE until August 11, when she
8  signed closing documents.  Naseth Decl. (Dkt. # 26) ¶ 2.

9  On August 8, 2005, someone notified Ms. Naseth that she should appear at a title
10  company's office on August 11 to sign loan documents.  Naseth Decl. (Dkt. # 16) ¶ 4.
11  There is no evidence that Ms. Naseth received any updated loan documents at that time.
12  *Id.* ¶ 5.

13  When she and Mr. Suiste arrived at the title company on August 11, they found
14  loans materially different than the ones disclosed in the GFEs and TILA disclosures.  A
15  new TILA disclosure for a first mortgage of approximately $225,000 revealed a 9.064%
16  interest rate, almost 3% higher than the rate disclosed in the June 30 GFE.  Anderson
17  Decl. (Dkt. # 28), Ex. 1.  Initial monthly payments on the loan were $1514.70, exceeding
18  the amount disclosed in the June 30 TILA disclosure by more than $300 each month.  *Id.*
19  The new TILA statement also checked the VARIABLE RATE FEATURE box.  *Id.*  Mr.
20  Suiste and Ms. Naseth signed the TILA disclosure on August 11, even though Ms. Naseth
21  is the only borrower listed on the form.  *Id.*  Ms. Naseth also received an estimated HUD-
22  1 settlement statement, with information corresponding to the new loan disclosed in the
23  TILA statement.  Naseth Decl. (Dkt. # 16), Ex. 1.  Ms. Naseth was the only borrower
24  listed in that statement, although Mr. Suiste's name was handwritten next to hers on the
25  "Buyer/Borrower" line.  *Id.*  Both Ms. Naseth and Mr. Suiste signed the HUD-1
26  statement on August 11.  *Id.*  That statement contains a "Settlement Date" of August 12.

27

28  ORDER – 4

*Id.* A final HUD-1 statement, reflecting a settlement date of August 16, shows Ms. Naseth as the only borrower. Naseth Depo., Ex. 10.

Ms. Naseth sued Quintet and a number of entities involved in the process of obtaining her mortgage. The pending motions focus only on her claims against Quintet. She alleges that Quintet violated the Washington Mortgage Broker Practices Act ("MBPA"), the Washington Consumer Protection Act ("CPA"), and regulations enforcing the Real Estate Settlement Procedures Act ("RESPA") and TILA. Quintet moves for summary judgment on all of those claims; Ms. Naseth contends she is entitled to summary judgment on some of them.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

The court begins with an overview of the statutes and regulations that govern the parties' disputes. The MBPA (RCW Ch. 19.146) regulates the practices of mortgage brokers. There is no dispute that Quintet is a mortgage broker within the meaning of the Act. RCW 19.146.010(14) (defining "mortgage broker" to include "any person who for compensation or gain, or in the expectation of compensation or gain . . . assists a person

ORDER – 5

in obtaining or applying to obtain a residential mortgage loan).  Among other regulations, the MBPA incorporates the obligations of TILA and Regulation Z (12 C.F.R. Pt. 226) and RESPA and Regulation X (24 C.F.R. Pt. 3500).  RCW 19.146.0201(11).  Violations of the MBPA are per se violations of the CPA.  RCW 19.146.100.

### A. Violations Arising From the June 30 Disclosures

When Ms. Naseth and Mr. Suiste applied for a loan on or about June 30, 2005, the MBPA required Quintet to provide a written disclosure of the fees and costs associated with the loan.  RCW 19.146.030.  The MPBA incorporates the disclosure requirements of TILA and RESPA.  RCW 19.146.030(2)(a)-(b) (declaring that compliance with Regulation X and Regulation Z suffices to comply with MPBA).  Regulation X requires a broker to mail or otherwise deliver a GFE within three business days of a loan application.  24 C.F.R. § 3500.7(a)(2) ("The lender must provide the GFE to the loan applicant by hand delivery, by placing it in the mail, or, if the applicant agrees, by fax, e-mail, or other electronic means.").  Where a lender chooses to send a GFE by mail, its notice obligation "shall shall be deemed to be satisfied by placing the document in the mail (whether or not received by the addressee) addressed to the addresses stated in the loan application . . . ."  24 C.F.R. § 3500.11.

At the threshold, the parties dispute whether Quintet satisfied its obligations to provide a GFE in connection with the June 30 loan application.  Quintet contends that it met that obligation by mailing two GFEs on June 30.  Ms. Naseth and Mr. Suiste deny that they ever received a GFE in the mail.  The parties devote much of their attention to a dispute over whether Ms. Naseth lost the GFEs because she did not frequently check mail at the address she provided to Quintet.  That dispute is irrelevant,[4] and ignores a more fundamental issue: there is no evidence from which the court could conclude as a matter

---

[4] Because Regulation X declares receipt of a mailed notice to be irrelevant, the sole issue is whether it was mailed.  Courts confronting the issue have held that evidence that a notice was not received does not suffice to create a genuine issue of fact regarding whether it was mailed.  *E.g.*, *Shields v. Morgan Fin., Inc.*, 125 P.3d 164, 167-68 (Wash. Ct. App. 2005) (affirming summary judgment that a notice was mailed despite evidence that plaintiff did not receive the notice).

ORDER – 6

of law that Quintet mailed the GFEs.  Mr. Wagnon addressed the mailing of the GFEs in two declarations, twice stating that Quintet mailed them on June 30.  Wagnon Decl. (Dkt. # 23) ¶ 4; Wagnon Decl. (Dkt. # 19) ¶ 5.  Mr. Wagnon does not declare that he has personal knowledge of the GFEs being placed in the mail.  He declares that "[a]ccording to Quintet's records, Quintet mailed [the] documents," Wagnon Decl. (Dkt. # 23) ¶ 5, but he does not identify those records.  He states that "Quintet employees follow a procedure for mailing [GFEs] and [TILA] Statements to loan applicants who apply via telephone," Wagnon Decl. (Dkt. # 19) ¶ 6, but he offers no basis for the court to conclude that Quintet followed the procedure in this case.  The GFEs themselves bear a handwritten notation at the bottom that appears to say "Mailed 6/30/05," but there is no evidence as to who placed that notation there or whether that notation is part of Quintet's system for ensuring that notices are mailed.  Without competent evidence that Quintet followed its procedures in mailing the GFEs to Ms. Naseth, whether Quintet mailed the GFEs remains an issue of fact for trial.  *See Crotty v. Dakotacare Admin. Servs., Inc.*, 455 F.3d 828, 831 (8th Cir. 2006) (holding that a party "must provide something that indicates that its mailing system was reliable and that the system was followed in the relevant instance").

   Assuming that Quintet actually mailed the GFEs, Ms. Naseth asserts that the disclosures therein do not comply with the law.  She focuses on the disclosures of fees that are payable to Quintet.  The GFE for the first mortgage discloses a "Mortgage Broker Fee" of "1.000%" amounting to $2311.60.  In a separate area labeled "COMPENSATION TO BROKER (Not Paid Out of Loan Proceeds)," the GFE discloses a "Broker Yield Spread" of "1-3%."  No dollar amount is stated.  The GFE also discloses a "Processing Fee" of $435, but does not explicitly state to whom the fee is payable.  The GFE for the second mortgage discloses a "Mortgage Broker Fee" of "1.000%" amounting to $577.90.  It does not identify any other compensation to the mortgage broker.

   Despite these disclosures, Ms. Naseth contends that Quintet violated the law by failing to disclose to whom the fees are paid and failing to disclose a yield spread

ORDER – 7

premium. Ms. Naseth is wrong as a matter of law. The GFEs disclose that a broker fee and yield spread premium would be paid to the mortgage broker. The GFEs also disclose that Quintet is the mortgage broker, as they state at the bottom that "[t]his Good Faith Estimate is being provided by Quintet Mortgage, LLC, a mortgage broker . . . ." The Processing Fee, unlike the other fees, has no disclosure of who will receive it. Nonetheless, Ms. Naseth has pointed to no authority that suggests that an otherwise accurate disclosure of a fee may violate the law simply because it does not itemize who will receive the fee. Indeed, the form that the United States Department of Housing and Urban Development provides for GFEs contains no disclosure of to whom settlement related fees will be paid. 24 C.F.R. § 3500.7(d) (referring to Appendix C to Regulation X); Appendix C (form online at http://www.hud.gov/offices/hsg/rmra/res/gfestimate.pdf). No reasonable factfinder could conclude that the June 30 GFEs failed to disclose the fees payable to Quintet from the borrowers or failed to disclose a yield spread premium.

Ms. Naseth also argues that the disclosure of a yield spread premium of one to three percent was unlawful. She is mistaken. The MBPA permits "a good faith estimate of a fee or cost . . . if the exact amount of the fee or cost is not determinable." RCW 19.146.030(1). The 2005 version of the applicable portion of Regulation X permitted the disclosure of estimates in the form of a range. 24 C.F.R. § 3500.7(c) (2005). That range, like any other GFE disclosure, was required to be "made in good faith and bear a reasonable relationship to the charge a borrower is likely to be required to pay at settlement, and must be based upon experience in the locality of the mortgaged property. 24 C.F.R. § 3500.7(c)(2) (2005). Thus, the court rejects as a matter of law Ms. Naseth's contention that a disclosure of a yield spread premium ranging from one to three percent is a per se violation of the law. As the court will later discuss, there is no question that the estimate was a good faith estimate of the premium at closing, because the premium ultimately charged was exactly 1% of the loan. Whether a 1% premium is reasonable in the Seattle market is, as the court will later discuss, an issue for trial.

ORDER – 8

**B.     Violations Arising From the June 30 Disclosures**

The court now turns from the June 30 documents describing the loans in question to the documents that Quintet first revealed on August 11. There is no question that the later documents described loans that were materially different than those Quintet described in the GFEs. According to the HUD-1 settlement statement that Ms. Naseth and Mr. and Mr. Suiste signed that day, the interest rate was much higher, as were the monthly payments. Naseth Decl. (Dkt. # 16), Ex. 1. Ms. Naseth was the sole borrower, rather than a co-obligor with Mr. Suiste. *Id.* The loan origination fee had ballooned from $2889.50 ($2311.60 from the first loan GFE plus $577.90 from the second loan GFE) to $3467.40. *Id.* A yield spread premium of $2311.60 was noted. *Id.*

There is also no question that Quintet's failure to disclose some of these changes was a violation of one or more laws. Its failure to disclose the changes to the interest rate and payments[5] violated Regulation Z, which requires such changes to be disclosed at least three days prior to the consummation of the transaction. 12 C.F.R. § 226.19(a)(2)(ii). The "consummation" date is "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(1)(13). The evidence shows that Quintet disclosed the changed interest rate on August 11, the same day that Ms. Naseth and Mr. Suiste signed the documents that made them contractually obligated on their mortgages. Quintet argues that the "loan consummated on August 17, 2005, as demonstrated by the Final HUD-1 Settlement Statement." Quintet Reply Br. (Dkt. # 30) at 3. The final Settlement Statement establishes a settlement date of August 16, not August 17. Naseth Depo., Ex. 10. Even assuming, however, that the settlement date of a mortgage transaction is the consummation date, the settlement statement that Ms. Naseth signed on August 11 disclosed a settlement date of August 12. Naseth Decl. (Dkt. # 16),

---

[5] As the court has noted, Quintet did not check the "VARIABLE RATE FEATURE" box on the June 30 TILA documents, but did on the August 11 document. All documents, however, disclosed loans with payments that varied over time. Because the parties have not addressed the issue, the court will not decide at this time whether a disclosure of varying payments suffices where the "VARIABLE RATE FEATURE" box is unchecked.

ORDER – 9

Ex. 1.  As a matter of law, Quintet violated Regulation Z by not timely disclosing the changes in Ms. Naseth's interest rate.

Quintet violated Regulation X and the MBPA by failing to disclose its increased loan origination fee.  Regulation X bound Quintet to its original disclosure of a $2889.50 origination fee[6] unless it disclosed not only the increase, but made that disclosure within three days of discovering changed circumstances that resulted in the increase.  24 C.F.R. § 3500.7(e)-(f).  Similarly, the MBPA prohibited Quintet from increasing any fee payable to itself unless it disclosed that change "no less than three business days prior to the signing of the loan" along with a "clear written explanation of the fee and the reason for charging a fee exceeding that which was previously disclosed."  RCW 19.146.030(4).  Quintet did not disclose the increase to its origination fee until August 11 and has provided no explanation for the increase.  Quintet did, however, disclose its $435 processing fee on the original GFE, and thus bears no liability for charging it.

Quintet also violated Regulation X by failing to disclose that it would not allow Mr. Suiste to serve as a co-borrower.  Quintet states that it discovered that Mr. Suiste was not creditworthy after reviewing his credit scores on July 19, 2005.  Wagnon Decl. (Dkt. # 19) ¶ 9.  Regulation X required Quintet to disclose any changes to the loans arising from this discovery within three business days.  24 C.F.R. § 3500.7(f)(2).  It did not do so.

C.    **Did Quintet Earn a Yield Spread Premium?**

Moving from Quintet's disclosure violations, the court now considers whether it earned the 1% yield spread premium it received.  For several reasons, that dispute must await trial.

Quintet received a yield spread premium of 1% of the amount of Ms. Naseth's first mortgage, or $2311.60.  That premium was at the bottom of the one-to-three percent

---

[6] The GFEs disclosed a "Mortgage Broker Fee," whereas the HUD-1 statements disclosed a "Loan Origination Fee."  Ms. Naseth seems to suggest that the change in label is itself an actionable violation.  The court disagrees.

ORDER – 10

range Quintet disclosed in the June 30 GFE, based on a loan amount of $231,160. Quintet thus adequately disclosed the premium.

      While Quintet's yield spread premium disclosure suffices, the court cannot determine whether Quintet actually earned that premium. A yield spread premium that a broker has not earned is an illegal kickback in violation of RESPA. *Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1206-07 (9th Cir. 2003) (citing 12 U.S.C. § 2607(c) and explaining that a yield spread premium is not a per se violation of RESPA). Courts apply a two-part test to determine whether a broker has earned a yield spread premium. *Id.* at 1207. They first look to "whether goods or facilities were provided, or services performed by the broker in the transaction." *Brazier v. Sec. Pac. Mortgage Inc.*, 245 F.Supp.2d 1136, 1143 (W.D. Wash. 2003) (citing *Bjustrom*). They then check to see if the total compensation has a reasonable relation to those goods, facilities, and services. *Id.* A court should look to whether "a particular charge for a mortgage deviates from market rates in the area for similar services." *Id.*

      The only evidence bearing on Quintet's services comes from Mr. Wagnon. He provides a list of services that Quintet provides, but offers no evidence as to which services were actually provided to Ms. Naseth. Wagnon Decl. (Dkt. # 19) ¶ 8. Instead, he asserts that "Quintet's files show that Quintet performed many of these services in conjunction with its loan to Naseth," but he provides none of the "files" he references. *Id.* On this record, the court cannot determine what services Quintet provided, much less determine that issue as a matter of law. Mr. Wagnon also declares that the premium Quintet received is reasonable within the Seattle market. Wagnon Decl. (Dkt. 19) ¶ 13. He offers no explanation of his basis for assessing the Seattle market beyond his bare declaration that he has "20 years of experience." *Id.* Ms. Naseth, however, has also failed to provide any evidence short of stating her dissatisfaction with Quintet. Proof that she was unhappy with Quintet's results is not proof that Quintet provided no services. Indeed, that she received a loan from Quintet is evidence that Quintet did *something*,

ORDER – 11

which is evidence enough to permit ruling in her favor on summary judgment. Moreover, Ms. Naseth offers no evidence on reasonable rates in the Seattle market. For at least these reasons, the court cannot determine as a matter of law whether Quintet earned the yield spread premium.

**D.      Ms. Naseth Has No Standing to Bring Her Remaining Claims.**

The court rejects Ms. Naseth's claim for a violation of the MBPA based on Quintet's alleged falsification of her loan application. Ms. Naseth contends that Quintet falsely stated that she and Mr. Suiste had a combined monthly income of $6900, when in fact they made around $4500 per month. This misrepresentation, however, did not act as a fraud upon Ms. Naseth, but at best a fraud upon lenders who Quintet hoped to induce to make them a loan. Ms. Naseth has no standing to pursue a claim of fraud directed at someone other than herself.

The court also rejects Ms. Naseth's claim that Quintet violated the MBPA and the CPA by including a clause in its agreement with Ms. Naseth that prohibited her from applying to another mortgage broker or lender for a period of sixty days. Naseth Depo., Ex. 7. The court need not decide whether this clause violated the CPA, because there is no evidence that Ms. Naseth was affected by it. She provides no evidence that she sought to make other loan applications, much less that she was deterred from doing so by this clause in the CPA.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part the parties' motions for summary judgment. Dkt. ## 15, 22. This order has determined the following issues (and only the following issues) as a matter of law:

1) The June 30 GFEs adequately disclosed Quintet's origination fee and processing fees and adequately disclosed a yield spread premium.

ORDER – 12

2) Quintet violated the law by failing to disclose prior to August 11 that it had changed the interest rate and origination fee on the loans it had offered to Ms. Naseth and Mr. Suiste, and that it had declined to offer a loan to Mr. Suiste.

3) Ms. Naseth has no standing to pursue a claim based on Quintet's inflation of her income or on the clause in her agreement with Quintet that prevented her from applying for other loans.

The court has not resolved the following issues, which are to be resolved at trial:

1) Whether Quintet earned the $2311.60 yield spread premium it charged Ms. Naseth; and

2) Whether Quintet mailed the June 30, 2005 GFEs to Ms. Naseth.

In addition, the court has not decided what remedies flow from Quintet's violations. The remedies ultimately depend on the court's resolution of the issues remaining for trial. The parties should be prepared to present, at trial, their position on what remedies flow from Quintet's violations.

The court has a jury trial in another case currently set to begin on November 15, the same date set for the bench trial in this matter. The court gives priority to jury trials, and thus places Ms. Naseth and Quintet on notice that their trial date may be delayed. The parties currently face a November 8 deadline for providing proposed findings of fact and conclusions of law, trial briefs, trial exhibits, and deposition testimony designations. The parties need not prepare proposed findings and conclusions, as the court prefers to receive these after trial.

In conjunction with the November 8 filings, the parties shall address the status of two Defendants: Stewart Title Guaranty Company and Acoustic Home Loans LLC. Stewart Title Company has been dismissed as a Defendant, but the parties made no formal statement regarding Stewart Title Guaranty Company. It appears that the latter company was erroneously named as a Defendant. The parties must clarify the situation. It appears that Acoustic Home Loans was never served. Ms. Naseth must clarify her

ORDER – 13

intent with regard to that party.  The parties may file motions in limine no later than November 3, with oppositions due no later than November 9.  They shall note the motions for November 9.

DATED this 27th day of October, 2010.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 14